**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LANETTE HOLMSTROM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| METROPOLITAN LIFE INSURANCE, | ) | |
| COMPANY and EXPERIAN | ) | |
| INFORMATION SOLUTIONS, INC. | ) | |
| EMPLOYEE WELFARE BENEFIT | ) | |
| PLAN, | ) | CASE NO.: 07-CV-6044 |
| | ) | |
| Defendant. | ) | Judge Robert M. Dow, Jr. |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |
| | ) | |
| METROPOLITAN LIFE INSURANCE | ) | |
| COMPANY | ) | |
| | ) | |
| Counter-Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LANETTE HOLMSTROM | ) | |
| | ) | |
| Counter-Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Lanette Holmstrom ("Holmstrom") filed a complaint initiating this action against Defendants Metropolitan Life Insurance Company ("Met Life") and Experian Information Solutions, Inc. Employee Welfare Benefit Plan (collectively "Defendants"). Defendants terminated Plaintiff's long term disability ("LTD") benefits and Plaintiff seeks review of that decision pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.* In addition to its answer, Met Life filed a one count counterclaim seeking to recover alleged overpayment of disability benefits to Plaintiff.

Currently pending before the Court are cross motions for summary judgment filed by Holmstrom [30] and Defendants [45]. Also before the Court is Defendant Metropolitan Life's motion for summary judgment on its counterclaim [45]. For the following reasons, Plaintiff's motion for summary judgment [30] is denied and Defendants' motion for summary judgment [45] is granted in its entirety.[1]

## I.      Background[2]

Plaintiff was employed by Experian Information Solutions, Inc. ("Experian") as a senior training specialist in Experian's Schaumburg, Illinois office. Pl. SOF ¶ 5; Def. SOF ¶ 8. In 1999, she moved to Missouri and continued to work for Experian from home. Def. SOF ¶ 8. Her employment with Experian continued until January 2000, when she stopped working in order to undergo surgery for her right ulnar nerve entrapment and neuropathy. Def. SOF ¶ 8; Pl. SOF ¶ 10. Defendant Experian Information Solutions, Inc. Employee Welfare Benefit Plan is the Plan Administrator of a group long term disability benefit plan ("the Plan") provided to eligible employees of Experian. Pl. SOF ¶ 6. As a benefit of her employment with Experian, Plaintiff received coverage under the Plan. *Id*. ¶ 8. Defendant Met Life is an insurance company authorized and engaged in the business of providing insurance in the State of Illinois. *Id*. ¶ 7. Met Life underwrote and insured the policy of disability insurance at issue here, which had an effective date of September 1, 1999, and acted as the claims administrator for that policy. *Id*.

---

[1] Plaintiff suggested in her motion for summary judgment that a "trial on the papers" pursuant to Fed. R. Civ. P. 52 would be proper if the Court could not resolve the issues according to Fed. R. Civ. P. 56. Defendants never responded to this proposal and therefore the Court proceeds solely under Rule 56.

[2] The relevant facts are taken from the Plaintiff's Local Rule 56.1 statement of facts ("Pl. SOF"); Defendants' response to those statements ("Def. Resp."); Defendants' Local Rule 56.1 statement of facts ("Def. SOF") and Plaintiff's response to those statements ("Pl. Resp."). Finally, the Court resolves genuine factual ambiguities in the respective non-movant's favor. See *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

### The Plan

Under the Plan, disability is defined as follows:

‘Disabled’ or ‘Disability’ means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and 1. during your Elimination Period and the next 24 month period, you are unable to earn more than 80% of your Predisability Earnings or Indexed Predisability Earnings at your Own Occupation for any employer in your Local Economy’ or 2. after the 24 months period, you are unable to earn more than 60% of your Indexed Predisability Earnings from any employer in your Local Economy at any gainful occupation for which you are reasonably qualified taking into your account your training, education, experience and Predisability Earnings. Your loss of earnings must be a direct result of your sickness, pregnancy or accidental injury. Economic factors such as, but not limited to, recession, job obsolescence, paycuts and job-sharing will not be considered in determining whether you meet the loss of earnings test.

Pl. SOF ¶ 9; Def. SOF ¶ 2.

The Plan also states that “Your Monthly Benefit is reduced by Other Income Benefits shown below.” Def. SOF ¶ 5. Benefits received because of the participant’s disability under the Federal Social Security Act are included as “Other Income Benefits.” *Id*. The “Monthly Benefit” “will not be further reduced due to cost-of-living increases payable under Other Income Benefits after the correct reduction has been determined.” *Id*. The participant must refund “an amount equal to any Overpayment which resulted from any period in which we were entitled to, but did not, reduce your Monthly Benefit.” *Id*. The Plan also states that “[w]e have the right to recover from you any amount that we determine to be an Overpayment. You have the obligation to refund to us any such amount.” Def. SOF ¶ 6.

### Claim History

On December 15, 1999, neurologist Diane Cornelison, D.O., wrote a letter to Eric Lomax, M.D. following her examination of Plaintiff. Def. SOF ¶ 9; Pl. SOF ¶ 18. In the introduction, Dr. Cornelison noted that Holmstrom “has had ongoing numbness and tingling

predominantly of the right hand of the fourth and fifth digits for approximately eight years, progressively worse" and the "numbness and tingling does awaken her and is aggravated with any type of repetitive movement."  Pl. SOF ¶ 18; Pl. Resp. ¶ 9.[3]  Based on a nerve conduction electromyogram ("EMG") study, Dr. Cornelison concluded as follows:

> IMPRESSION:  This is an abnormal study consistent with:
> 1.        Right ulnar neuropathy, which is electrically mild to moderate with evidence of ongoing denervation.  The compression appears to be about the ulnar groove and just distal to the ulnar groove.
> 2.        There is no electrical evidence to support a right carpal tunnel syndrome.
> 3.        There is no electrical evidence to support a left ulnar neuropathy.
> 4.        There is no electrical evidence to support a right cervical radiculopathy.
>
> CONCLUSION:  We will refer back to you for possible surgical intervention.

Def. SOF ¶ 9; Pl. SOF ¶ 18.

On January 5, 2000, Dr. Lomax performed surgery on Plaintiff in an attempt to correct her ulnar compression.  Def. SOF ¶ 9; Pl. SOF ¶ 19.  Following surgery, Met Life paid short term disability benefits to Holmstrom for twenty-six weeks, the maximum period under the Plan. Def. SOF ¶ 10; Pl. SOF ¶ 11.  On April 20, 2000, Holmstrom visited Dr. Cornelison complaining of pain in her right elbow and wrist.  Def. SOF ¶ 11.  Dr. Cornelison noted "Tinel's was positive on examination over the ulnar nerves bilaterally" and injected the ulnar scarring with Depo-Medrol.  Pl. Resp. ¶ 11.  Holmstrom then received another EMG from Dr. Cornelison on May 17, 2000, which noted "electrically mild" evidence of a nerve condition block adjacent to the scar tissue on Plaintiff's right elbow.  Def. SOF ¶ 11; Pl. SOF ¶ 20.  On June 6, 2000, Dr. Lomax performed surgery on Plaintiff to release a section of her ulnar nerve entrapped by scar tissue.

---

[3] New facts included in response to statements of fact generally are not considered.  See *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000) (citing *Midwest Imports v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995)).  However, when it appears that a party is selectively presenting facts from a document, the Court will consider additional language from the same document for the sake of completeness.

Def. SOF ¶ 12; Pl. SOF ¶ 20.  Following the second surgery, Plaintiff was prescribed Percocet and Oxycontin, although she complained that the Oxycontin made her too nauseated.  *Id.*

Met Life approved Holmstrom's claim for long term disability on June 27, 2000 at the rate of $2,591.78 per month.  Def. SOF ¶ 13; Pl. SOF ¶ 12.  On that same date Met Life noted "expected recovery time is at 6 weeks from [surgery] on 06/06/00."  Def. SOF ¶ 13.  Met Life's rationale for that date was Holmstrom's "[attending physician] states that [patient] will need 6 [weeks] to recover [status post] surgery on 06/06/00."  *Id.*

On August 2, 2000, Dr. Lomax called Met Life and reported "his concern for [Holmstrom's] questionable disability."  Def. SOF ¶ 14.  He stated that "[Holmstrom] is not getting any better and she should be"; "her symptoms keep changing at every visit"; "at one occasion where [Holmstrom] approached him to shake hands, [she] had to think about not using the disabling arm"; and "there are no neurological or clinical problems that can be identified." *Id.*  Dr. Lomax then requested that Met Life obtain a functional capacity evaluation ("FCE") to assess Plaintiff's physical capabilities.  *Id.*

Holmstrom underwent an FCE on October 18 and 19, 2000.  Def. SOF ¶ 15; Pl. SOF ¶ 22.  The report stated:

> Pain Behavior:  Client presents with a very guarded/protective posturing of the right upper extremity in adduction, 90 degree elbow flexion with slight shoulder elevation.  All lifts and carries were calculated and slow with minimal evidence of full right hand grasp for gross and fine motor activities.  Client's pain behavior and c/o pain were consistent and directly related to activities that stressed the r. arm and hand during activity.  Client demonstrates avoidance of active use of right upper extremity/hand unilaterally and as a bilateral asset.
>
> Safety:  Client demonstrated good body mechanics and evidenced understanding of safety techniques.
>
> Quality of Movement:  Slow, guarded and cautious.  Transfer of hand dominance from right to left.  Fatigue consistently throughout day one and day two as well as

from day one to day two.  Fine motor coordination/dexterity in the right is rigid and choppy and very laborious.

Significant Abilities:  Sitting tolerance.  Gross motor movement in a variety of planes void of the use of the bilateral upper extremities in stressed or prolonged positions.  Good lower extremity and trunk ROM and strength.  Excellent communication skills and evidences a self motivated and goal oriented approach to responsibilities.

Significant Defects:  Bilateral upper extremity weakness and endurance. Poor bilateral fine motor dexterity and coordination with client attempting to compensate by changing hand dominance from right to left. Below average strength in the right hand for grip and low average in the left.

Job Description Explored:  According to results of the FCE she best matches the definition of "sedentary" given by the Department of Labor.  However, many sedentary jobs require varying levels of hand coordination, dexterity and strength.  Please refer to the FCE report for results.  Due to not having a more defined functional job description with specific critical demands, it is difficult to give a definitive job match

*Id*.  The FCE also noted that Holmstrom was able to maintain a sedentary position for 68% to 100% of an 8-hour workday and that she had no limitations in tests of lower extremity strength.  *Id*.

On November 17, 2000, Met Life approved Holmstrom's claim for continued disability benefits under the "own occupation" standard.  Def. SOF ¶ 16.  Holmstrom states that she sought treatment at the Regional Center for Pain Management at Cox North between November 2000 and January 2001, when she allegedly received a variety of nerve blocks.  Pl. SOF ¶ 23.  Pursuant to a request by Met Life, Holmstrom submitted a report of her daily activities on January 8, 2001.  *Id*. ¶ 24.  In that report, Plaintiff stated that she was suffering from the following ailments:  complete loss of use of dominant right arm and hand; deterioration of her left arm and hand; and situational (although not clinical) depression.  *Id*.  She also reported that the limitations were preventing her from caring for her son, preparing meals, and taking care of

personal hygiene without assistance. *Id.* Finally, Plaintiff reported that she rarely left home for anything but medical appointments and that she was dependent on her husband to drive her. *Id.*

Holmstrom continued to see Dr. Lomax for pain management until the middle of 2001. Pl. SOF ¶ 25; Def. Resp. ¶ 25. Dr. Lomax prescribed several different medications including Oxyfast, Percocet, MScontin, Diazepam and Amitriptyline. Pl. SOF ¶ 25. During the period of her care under Dr. Lomax, Plaintiff was reporting pain at a severity level of up to 10 out of 10. *Id.* Holmstrom also saw her general physician, Dr. Arthur Hale from at least July 2000 to August 2001. *Id.* ¶ 26. In the charts from this period, Plaintiff complained of right hand pain, once stated that she had been very depressed and once complained of mild low back pain. *Id.* The charts also indicate that Holmstrom was taking pain medication. *Id.*

On November 13, 2001, Met Life informed Holmstrom that it would be evaluating her eligibility for disability benefits under the Plan's "any occupation" standard for disability. Def. SOF ¶ 17. Met Life therefore asked Plaintiff to have her current medical provider submit a Physical Capacity Evaluation Form, progress/treatment notes, and objective test results since June 6, 2000. *Id.* Holmstrom failed to comply with Met Life's request for proof of continued disability, and on March 6, 2002, Met Life denied her disability claim. *Id.* ¶ 18. On March 13, 2002, Holmstrom submitted 146 pages of documents to Met Life, including medical records from Dr. Lomax, Dr. Hale, and an orthopedic surgeon at Kansas State University, Dr. Bruce Toby. *Id.* ¶ 19. Met Life then reinstated Plaintiff's monthly benefit payments while evaluating her eligibility for benefits. *Id.*

Dr. Toby examined Plaintiff for the first time on June 20, 2001. Def. SOF ¶ 20. Dr. Toby noted that after her second surgery "she became even worse. She has been diagnosed as

having reflex sympathetic dystrophy.[4]  She has had a number of blocks, all of which have been unsuccessful.  She is on a variety of pain medications * * *."  Pl. Resp. ¶ 20.  He also stated she "has had numerous electrodiagnostic studies.  Her most recent electrodiagnostic study interestingly was reported by Dr. Varghese to show improved ulnar nerve conduction across the elbow.  However, again the patient had a transposition, and comparisons might be difficult.  The EMG component was unremarkable, except for increased polys noted."  Pl. SOF ¶ 27.  He went on to state that "[s]he has good range of motion of her elbow. She does not show obvious intrinsic atrophy.  She has good range of motion of the wrist and fingers"; "[s]he seemed to have hypersensitivity over the course of the ulnar nerve, but does not have obvious signs of reflex sympathetic dystrophy."  Def. SOF ¶ 20.  At the conclusion of the treatment plan, Dr. Toby stated that since "she feels that she is making some improvement, we decided to do no surgeries at this point."  *Id.*

Dr. Toby performed a follow-up examination on August 1, 2001.  Def. SOF ¶ 21.  The chart from that visit noted that Holmstrom complained of pain in her right arm "which just by touching, made her jump," and pain in her left arm.  *Id.*  The chart also noted that the most recent EMG study "did not show terrible signs of denervation," and that Holmstrom did not display the characteristic physical signs of CRPS.  *Id.* ¶ 22.  Specifically, he noted "[a]gain, her complaints are mostly subjective.  Her hand does not show classic appearance of sympathetic maintained pain.  There are no color changes, no excessive sweating, no coolness to touch."  *Id.*  Dr. Toby recommended that Holmstrom "stay away from surgery, refrain from taking large doses of

---

[4] According to a Social Security Administration Policy Interpretation, Reflex Sympathetic Dystrophy Syndrome ("RSDS"), now known as Complex Regional Pain Syndrome ("CRPS") is "a chronic pain syndrome most often resulting from trauma to a single extremity * * * The most common acute clinical manifestations include complaints of intense pain and findings indicative of autonomic dysfunction at the site of the precipitating trauma * * * [P]atients typically report persistent burning, aching or searing pain that is initially localized to the site of the injury."  The Court will refer solely to CRPS.

narcotics and engage in outside activities." *Id.* ¶ 23. He thought "she should be treated for what I consider significant depression." Pl. Resp. ¶ 23. "[Holmstrom and her husband] should try to do maybe other outside activities, and not be overwhelmed by her subjective pain complaints. This is really not the answer that they were listening for. I am not sure exactly what they had in mind. I do not think that continuing large doses of narcotics would be advisable in this patient. I have nothing further to offer her." Def. SOF ¶ 23.

In July of 2001, Drs. Lomax and Hale included notes in their respective medical charts that Holmstrom was violating pain management agreements by seeking pain medication from more than one source. Def. SOF ¶¶ 24-25. On May 30, 2002, Holmstrom sent a facsimile to Met Life listing the history of her medical treatment to that point. Def. SOF ¶ 26. In that facsimile, she stated that after August 2001, she continued to see Dr. Toby for six months on a weekly basis and that he "continued to prescribe my pain medication however he was uneasy about the dosage of medication I was taking. In February of 2002 he discontinued giving me prescriptions. My family and I continued looking for new solutions." *Id.* In that same facsimile, Holmstrom stated that in January 2002 she saw Dr. Grillot, who "felt that the ulnar nerve was pinched to the wrist. He recommended surgery to release it." *Id.* ¶ 27. Holmstrom noted a visit for pain management on February 25, 2002, to Dr. Weber, who conducted an EMG which indicated that "both hands were below normal." *Id.* Holmstrom stated that Dr. Weber then wrote her "prescriptions and agreed to see me after Dr. Grillot performed the surgery on my right wrist." *Id.* The fax also indicated that Dr. Weber believed that Holmstrom was in Stage 1 of CRPS and prescribed her 100 mgs of methadone per day, but felt that the methadone had given her very little pain relief. Pl. Resp. ¶ 27. In the same fax, Holmstrom stated that on March 1, 2002, Dr. Grillot performed surgery on her right wrist because "the ulnar nerve was significantly

pinched and the carpal nerve was mildly pinched. I have had follow-up visits with Dr. Grillot but I haven't really had pain relief from the surgery." Def. SOF ¶ 28; Pl. SOF ¶ 28. The fax continued:

> March 15th, 2002 – At Dr. Weber's referral I met with Dr. Carlson. Dr. Carlson and I talked for over an hour about my illness and the medications I've been taking. We talked about addiction and he felt that I was not addicted. He felt that I am in genuine pain and that I need genuine medication. He was confused as to why Dr. Weber had changed my medication to methadone. Unfortunately I could give him no answer. We discussed the dosage of methadone and he did not feel that it was at a therapeutic dosage. After we talked he said he did not need to continue to see me because he deals with addicted patients and I don't qualify.
> - I have continued to see Dr. Weber. He has tried a variety of different medications (most of which I had already tried). He upped my methadone to 120 mgs and then to 140 mgs. I continue to have pain and asked for more pain relief from the methadone, he will discontinue the methadone and give me nothing for pain relief.

Def. SOF ¶ 29.[5]

On July 3, 2002, Met Life approved Holmstrom's claim for benefits under the "any occupation" definition of disability. Def. SOF ¶ 30. At some point in 2003, Holmstrom moved from Missouri to Alberta, Calgary. Holmstrom initially received medical care and treatment from Wiliam Grisdale, M.D., an internist, and, beginning in June of 2004, from Thomas Vant, M.D. Def. SOF ¶ 31. A letter from Dr. Grisdale to Dr. Vant stated that Holmstrom had CRPS, that her medications were methadone 250 mg three times per day, and that because she was not sleeping, Dr. Grisdale he had added 32 mg Dilaudid at bedtime. *Id*. ¶ 32. Dr. Vant worked with

---

[5] A similar document authored by Holmstrom stated: "March 15th, 2002 – At Dr. Weber's referral I met with Dr. Carlson. Dr. Carlson and I talked for over an hour about my illness and the medications I've been taking. We talked about addiction and he felt that I was not addicted. He felt that I am in genuine pain and that I need genuine medication. After we talked he said he did not need to continue to see me because he deals with addicted patients and I didn't qualify. I asked Dr. Carlson if he would refer me to another pain specialist. He referred me to see Dr. Duff. Dr. Duff took over my case and after confirming the Reflex Sympathetic Dystrophy diagnosis, worked with me to try methadone for pain treatment. He successfully got me on to the methadone. I continued to see Dr. Duff monthly, and we continued to try different things. Pl. SOF ¶ 28.

Holmstrom from July 2004 to April 2007 and prescribed methadone, hydrocodone, elavil, amitriptyline, and clonidine.  Pl. SOF ¶ 29.

On May 6, 2005, Met Life began a periodic review of Holmstrom's ongoing eligibility for disability benefits.  Def. SOF ¶ 33.  It requested updated medical records, test results and a statement from her treating physician identifying her functional restrictions and limitations.  *Id*.  On June 8, 2005, Met Life received an Attending Physician Statement ("APS") and Physical Capacities Evaluation ("PCE") signed by Dr. Vant.  Def. SOF ¶ 34; Pl. SOF ¶ 32.  The APS indicated that Holmstrom's primary diagnosis was CRPS.  *Id*.  The APS also noted that, as a result of her medications, Holmstrom had "impaired cognition," which would affect her ability to perform the duties of her job and he concluded that she would be "unable to work again – permanent disability."  Pl. SOF ¶ 32; Pl. Resp. ¶ 34.  Dr. Vant opined in the PCE that Holmstrom could not sit for more than one hour per day, stand for more than fifteen minutes per day, or walk for more than fifteen minutes per day due to pain from CRPS.  Def. SOF ¶ 35.  The report also indicated that Holmstrom would not be able to lift or carry any amount of weight, reach above shoulder level, or operate a motor vehicle.  Pl. SOF ¶ 32.  He finally indicated that Holmstrom could not use her right hand for repetitive action such as simple grasping, pushing and pulling, or fine manipulation. Pl. SOF ¶¶ 29, 32.

Met Life then consulted John Thomas, M.D., a physician board certified in physical medicine and rehabilitation.  Def. SOF ¶ 36.  His consultant review, dated July 7, 2005, answered the question "Does current medical information support a severity of impairments/level of limitations preventing Ms. Holmstrom from doing her own work?"  *Id*.  Dr. Thomas' report answered:

> No.  At this time, the only current information I have is a stand alone MetLife Attending Physician Statement of Disability 6/8/05 from Dr. Vant.  This is the

most restrictive APS in the file. It is without physical exam or accompanying office notes with physical examinations to clearly substantiate. It is without further or more recent testing results. It is without any other consultant or treatment activity notes – neurology, physical therapy, pain management, etc. Therefore, it is a stand alone form only, without all of these usual, typical, ongoing care activity notes, it is unsubstantiated. I cannot correlate a current physical examination to the significant restrictions and limitations that Dr. Vant is placing on this form.

Def. SOF ¶ 36.

When asked to comment on current appropriate restrictions and limitations, Dr. Thomas

stated:

Unable to do so. We certainly do have Dr. Vant's current restrictions and limitations. I am again without recent, detailed neuromuscoskeletal examination or any other supporting notes or test findings which would allow me to substantiate/fully explain these very significant restrictions and limitations offered by Dr. Vant 6/8/05.

Def. SOF ¶ 37.

Dr. Thomas also stated:

I contacted Dr. Vant's office 07/05/05. I spoke with one of his office staff who was very cordial and pleasant. I asked for, after introducing myself, copies of Dr. Vant's office notes beginning 07/06/04 up to the present. If that was not possible, I then asked to have Dr. Vant call me to discuss his findings so that I could try and correlate them with the severe restrictions that he is now issuing. I left both my phone number and an appropriate fax number for Dr. Vant's office to use. I did not receive a call back or receive faxed information the remainder of 07/05/05, on into 07/06/05, ending today 07/07/05.

Def. SOF ¶ 38.

Dr. Vant did not fax anything directly to Dr. Thomas, but did fax four pages of his office examination notes to Met Life on July 6, 2005 for the periods of July 6, 2004 -October 27, 2004 and March 22, 2005 – June 8, 2005. Def. SOF ¶ 39. These office notes included: (i) March 22, 2005 – Elavil 75 mg. one am two qhs. Dilaudid 8 mg IV qhs, Methadone 250 mg. tid. Increased numbness arm. EMG.; (ii) April 18, 2005 – Still getting numbness, paresthesia. Trial of

Topomax 25 g. Restart – go slow and progress.; (iii) May 16, 2005 – Increased pain, more numbness. On Topomax 25 mg bid. Increase to 75 mg/day. Increased hyperhydrosis in right arm.; and (iv) June 8, 2005 – Refill of meds. *Id.*

On July 15, 2005, Met Life sent a fax of Dr. Thomas' Physician Consultation Review to Dr. Vant and requested that he provide medical documentation to support his position no later than July 29, 2005. Def. SOF ¶ 40. On August 5, 2005, Met Life declined Holmstrom's disability claim on the basis that Dr. Vant's restrictions and limitations were not supported by any objective findings and the file review concluded her restrictions and limitations were not severe enough to preclude working. Def. SOF ¶ 41; Pl. SOF ¶ 12.

On August 22, 2005, Dr. Vant faxed 24 pages of documents to Met Life. Def. SOF ¶ 42. Those pages included his office examination notes from July 6, 2004 – July 20, 2005, a statement of medical history prepared by Holmstrom, a nuclear bone scan obtained on August 10, 2004, and an EMG obtained on June 7, 2005. *Id.*

The nuclear bone scan was interpreted by radiologist Kenneth Sato, M.D., who opined:

Flow study to both arms and blood pool images of both arms appear normal. Anterior and posterior total body planar images as well as additional camera views of the arms and neck have been performed on a delayed basis. Increased radiotracer accumulation is seen at the apophseal joints at the right and left side of the cervical spine. Moderate symmetric radiotracer accumulation is seen at both fibular necks. The bone scan is otherwise unremarkable. No abnormalities of either arm, hand or wrist are seen.

CERVICAL SPINE – NO OBLIQUE    There is disc space narrowing at C5-6 with associated marginal spurring of the vertebral bodies. There is 4 mm of retrolisthesis of C5 and C6 evident. Degenerative facet disease is noted diffusely at the cervical spine, most marked at the left side of C3-4 and at the right side of C4-5 and C6-7.

BOTH KNEES    Small degenerative spurs are noted at the superior and interior poles of both patellae and at eth lateral joint margins of both knees. Pointing of the tibial spines is a degenerative phenomenon. Small bilateral knee joint effusions are suspected.

> SUMMARY: Degenerative disc and facet disease of the cervical spine as described. Mild to moderate degenerative change of both knees as described. The symmetric activity at the left fibular heads and necks on the tibia and not due to a pathologic process.

Def. SOF ¶ 43; Pl. SOF ¶ 30.

The June 7, 2005 EMG was performed by neurologist Gary Klein, M.D. The report begins, "She reports pain of the ulnar two or three digits, the ulnar border of the hand, with pain going up to the elbow. She is quite dysesthetic over the ulnar border of the elbow, and any kind of touching there produces more pain." Pl. SOF ¶ 31. Based on his physical examination of Holmstrom, Dr. Klein opined "On examination today, she has a good range of neck motion. Cranial nerves are intact. She is very reluctant to move the right arm. Otherwise, power is normal. Reflexes are well preserved. She has dysesthesia around the right elbow, but not really elsewhere." Def. SOF ¶ 44. Dr. Klein's report noted her current medications included methadone at 250 mg three times per day and hydrocodone 30 mg at night. *Id.* Dr. Klein also stated that "both median and both ulnar nerves are within normal limits" and concluded that "Today's study is negative. In particular, it rules out a true nerve entrapment syndrome." *Id.* at ¶ 45.

Dr. Vant faxed an FCE form to Met Life on September 6, 2005. Def. SOF ¶ 46; Pl. SOF ¶ 31. The FCE had been performed by Kellie Leslie, a physical therapist, on August 31, 2005. *Id.* It noted that Holmstrom was 0% of normal for Range of Motion for all aspects of her lumbar spine including flexion, extension, right lateral flexion and left lateral flexion. *Id.*; Pl. Resp. ¶ 47. For her right lateral flexion, Ms. Leslie commented she was " 4" away" and for her left lateral flexion, that she was " 1" away". Pl. Resp. ¶ 47. It also noted Holmstrom's pain level as 6.5/10, repetitive sit-up was 0% of normal, modified Thomas 0% of normal, straight leg raise

44% of normal (with pain in lower back), knee flexion: right 60% and left 47%, hip internal ROM 50% of normal, hip external 0% of normal, repetitive push-up 0% of normal (unable to put weight on hands due to pain), static back endurance 6% of normal, and repetitive squat 10% of normal. Pl. SOF ¶ 33; Pl. Resp. ¶ 48. Her post testing pain results were 8/10. *Id*. The FCE included that Plaintiff was able to stand on her left leg for 3 seconds and on her right leg for 4 seconds and that she had a 6 second static back endurance. Def. SOF ¶ 47. Under the conclusions/concerns sections of the FCE, Ms. Leslie stated "Patient feeling fatigue and pain with more physical activity" and "Patient reports that she is feeling incapable to perform her former job as senior computer technician. She reports medication affects her memory and has [increased] pain after computer for 10 minutes. Therapist reports patient displaying emotional behavior such as crying when talking about her pain and capabilities in daily activities." Def. SOF ¶ 48; Pl. Resp. ¶ 48.

Dr. Vant sent another letter to Met Life on September 12, 2005, in which he stated his findings indicating Holmstrom would likely never be able to return to work in any occupation. In that letter, Dr. Vant noted that the diagnosis of CRPS had not changed, nor had Holmstrom's symptoms resolved. Dr. Vant emphasized that Holmstrom experienced significant pain throughout her right arm and into her neck, and pointed out that the 250 mg of methadone she had been prescribed is a substantial dose of pain medication. He also referred to the results of August 31, 2005 FCE and maintained his opinions that Holmstrom was unable to lift anything with her right arm, that bending and squatting were problematic due to balance, and that she was precluded from driving. Pl. SOF ¶ 34

Holmstrom appealed Met Life's benefit decision. Def. SOF ¶ 49; Pl. SOF ¶ 13. Along with the appeal letter, Plaintiff submitted a notice of award from the Social Security

Administration ("SSA") dated January 3, 2005, letters from three family members (Holmstrom's husband, her teenage son, and her sister-in-law), and a letter from Dr. Vant dated December 19, 2005. Def. SOF ¶ 49.

Holmstrom's husband reported he had observed his wife's disability cause her limitations in a number of areas. Pl. SOF ¶ 35. He stated that CRPS-related pain kept her from doing even simple tasks, such as pushing the cart at the grocery store, driving, and taking care of household chores. *Id*. He also remembered her as having an independent and upbeat personality prior to developing CRPS, but stated that constant pain prevents her from doing many things she once could. *Id*. He also noted her medication affects her memory and causes sleep disruptions. *Id*.

Holmstrom's son reported that pain prevented his mother from doing things such as opening a car door or carrying a basket of laundry. Pl. SOF ¶ 36. He stated that he had previously engaged in activities with his mother such as playing computer games, but those activities were no longer possible. *Id*. He also observed Plaintiff had difficulty concentrating and remembering things, and stated that the impact of her condition on their family was significant. *Id*.

Holmstrom's sister-in-law stated that she had known Holmstrom for more than thirty years and watched her go from a motivated, career-orientated woman to one who struggles through daily pain and who has significant difficulty remembering things. Pl. SOF ¶ 37. She also noted that Plaintiff's husband had to manage most of the family's affairs, including keeping track of Holmstrom's medications and medical appointments. *Id*. She observed Holmstrom in obvious significant pain and noted that she often had to leave family functions because of pain. *Id*.

Met Life then consulted Janet Collins, M.D., a board certified physician in occupational and environmental medicine who prepared a Physician Consultant Review ("PCR") dated January 30, 2006.  Def. SOF ¶ 50.  Dr. Collins noted in the PCR that she reviewed: Dr. Thomas' PCR from July 7, 2005 which summarized the available medical records from 1999 to 2004, the FCE performed by Ms. Leslie on August 31, 2005, two letters from Dr. Vant dated September 12, 2005 and December 19, 2005, and a letter from Holmstrom's attorney dated October 10, 2005.  *Id.*; Pl. Resp. ¶ 50.  Dr. Collins made the following statements in her January 30, 2006 report:

> Despite Dr. Vant's assertion in the correspondence submitted since the initial Independent Physician Consultant Report generated on 7/7/05, there is little in the way of objective data submitted to the file to support functional limitations and an inability to function from 8/6/05.  The Functional Capacity Evaluation dated 8/31/05 states that the Claimant is unable to fully flex either knee, that she is unable to rotate either hip but there is no indication in the available file that any pathology is related to the knee or hip.  It is perhaps an unwillingness on the part of the claimant to perform these maneuvers as part of her Functional Capacity Evaluation.  In addition, there is no flexion or extension recorded of the lumbar spine and therefore it is assumed that she maintains a completely rigid posture at all times.  This is not a realistic finding in a Functional Capacity Evaluation.  The comments listed in the report also allude to the claimant asserting that she is unable to work and displaying emotional behaviors when talking about her pain.

> Dr. Vant's correspondence from 12/19/05 disagrees with the Independent Physician Consultant's evaluation and states that with regard to objective findings, electrodiagnostic and imaging studies were normal.  He goes on to list that with regard to physical exam findings, she has substantial complaints of pain which, of course, are subjective and not true objective findings on physical exam.  He also maintains that she is only able to sit for an hour, stand for 15 minutes and walk for 15 minutes without a change in position, rest or stretch.  However, there is no objective documentation of these findings elsewhere within the file.  The final conclusion he reaches in this correspondence is perhaps the most telling with regard to his assertion of her functional capabilities.  He states that 'her predominant symptom of her disability is intractable pain poorly responding to any modalities in the past, poorly responsive to pharmacological modalities in present time and this is unlikely to change, therefore she is totally disabled from any work whatsoever.'  In summary, it appears as though Dr. Vant opined that the claimant remains permanently and totally disabled from any gainful employment secondary to her subjective complaints of intractable pain.  The objective findings

listed in the FCE described above are lacking in specificity and quantification with regard to limitations of her body parts that are not known to be affected by the documented illness. Results of the 8/31/05 FCE are therefore somewhat unclear and vague with regard to her overall functional level. Therefore, in summary, there remains little objective data in the available file to support the functional limitations and inability to function from 8/6/05.

It is unclear that the pain and/or the medications prescribed for the pain have quantifiably limited her capability to perform in a work place situation. There is no neurobehavioral testing, no psychological testing, no listing of activities of daily living in the available file to support the assertion that her pain and/or medication effects are limiting her functional capabilities. Several testimony letters were submitted to the file from her family members stating that she is unable to perform many of the activities that she did in the past, however, this has not been quantified in any objective manner via testing such as that listed above.

Def. SOF ¶¶ 51-53.

Dr. Collins also stated in the PCR that the side effects from medication could be quantified by undergoing a battery of neurobehavioral and neuropsychological testing. Def. SOF ¶ 54. She concluded that the information in Holmstrom's file fails to contain sufficient objective data to support that she is unable to perform any gainful employment in the workplace. *Id.* ¶ 55.

Dr. Collins supplemented her report following with a summary of a phone conversation she had with Dr. Vant on February 3, 2006:

According to the 8/31/05 FCE, range of motion of the lumbar spine was listed at 0% flexion extension, right and left lateral flexion. I asked Dr. Vant if the claimant is in a permanently rigid position or if she does have range of motion at her lumbar spine. He replied that she does indeed have range of motion in her lumbar spine. Secondly, I read the findings from the 8/31/05 FCE regarding limitations in knee flexion bilaterally, limitations in internal and external rotation of the hip. Dr. Vant could not account for these limitations as he stated to his knowledge there was no pathology in those joints. * * *. I then confirmed with Dr. Vant that her intractable pain is the reason which he has declared her disabled and he agreed with this.

It remains that there are no objective findings to support ongoing total disability in this case. Dr. Vant asserts that intractable pain and cognitive deficits are the limiting factors in the claimant's ability to function in the work place. Neither of these factors has been well documented objectively, however, in recent submissions to the file. The claimant, in addition, has not undergone any

psychological assessment to determine whether there are psychological issues interfering with her willingness to rejoin the workforce.

It would perhaps be a reasonable next step in determining level of function in the claimant, to assess her neurocognitive status via formalized testing. This battery of testing, if conducted properly, could assess her ability with regard to processing information, short term memory and general level of function. After such evaluation, a more precise assessment of her work abilities could be made. If there is a psychological component to her condition, perhaps psychological assessment would be reasonable as well.

* * *

In summary, there are no objective findings in the available file to support ongoing total disability. If neurocognitive and pain factors are indeed totally disabling in this case, it is suggested that additional information as discussed above be submitted to the file in order to more precisely quantify appropriate restrictions and limitations.

Def. SOF ¶¶ 56-59, 61-62. Dr. Collins' February 3, 2006 PCR also stated that the FCE conducted on August 31, 2005 "seems unreliable" based on the "emotional component displayed by the Claimant during the exam, her inability or unwillingness to flex or extend at the lumbar spine and limitations in those joints which are known not to be affected by her pain complaints." *Id.* ¶ 60.

On February 8, 2006, Met Life upheld its decision, relying on the reports of retained consulting physicians that Holmstrom failed to establish eligibility for disability benefits beyond August 5, 2005. Def. SOF ¶ 63; Pl. SOF ¶ 13. Plaintiff then filed suit on March 2, 2006, in the Northern District of Illinois, for judicial review. Pl. SOF ¶ 14. On October 5, 2006, without a final judgment, the parties agreed to a voluntary remand to Met Life for review of Holmstrom's claim to address issues raised by Met Life's reviewing physician-consultant. *Id.* Holmstrom, through her attorney, then submitted her second appeal to Met Life on March 28, 2007. Def. SOF ¶ 64; Pl. SOF ¶ 15. Her appeal included an FCE performed by Janet Fasakin, a physical therapist, on March 7 and 8, 2007, and a letter dated March 15, 2007 from Kent Noel, Ph.D. to

Holmstrom's attorney regarding results of a Schubert General Ability Battery ("SGAB") performed by Dr. Noel in March 2007. *Id*.

The March 2007 FCE included the following statements reflecting the functional status of Holmstrom on that date:

> 1. Mrs. Holmstrom stood for 6 minutes on both legs before asking for a seat, one leg stance test recorded 1.5 secs on right leg and 10 secs on left leg. Her standing tolerance did not meet the Demand Minimum Functional Capacity requirement of standing for 30 minutes continuously.
> 2. Mrs. Holmstrom walked for 3.25 mins at 1.3 mph. Her walking tolerance did not meet the Demand Minimum Functional Capacity requirement of walking for one mile continuously.
> 3. Mrs. Holmstrom sat for 20 minutes. Her sitting tolerance did not meet the Demand Minimum Functional Capacity requirement of sitting for 30 minutes continuously.

Def. SOF ¶ 65; Pl. SOF ¶ 38. The results indicated that Holmstrom failed to meet the Minimum Functional Capacity requirement in a variety of areas, including pushing, pulling, reaching with either arm, and grasping with both hands. Pl. SOF ¶ 38. Ms. Fasakin stated that Holmstrom did not meet the minimum strength requirement for the low strength category job. Pl. SOF ¶ 38; Pl. Resp. ¶ 65. Ms. Fasakin placed Holmstrom in the low endurance category. Pl. SOF ¶ 38. She was unable to recommend when, if ever, Holmstrom would be able to return to work. *Id*. Ms. Fasakin continued that Holmstrom might have the physical capability to work a maximum of 3 hours a day if she could use voice recognition software, although that would depend on her mental and cognitive status. *Id*. At best, Holmstrom would be able to work in sessions of no longer than 30 minutes, and no more than 2-3 days per week although this could be further limited by cognitive limitations that were not accounted for in the FCE. *Id*.

The letter from Dr. Kent Noel "addresses the question of whether or not Lanette Holmstrom can focus on new information, retain and process information, and make decisions that would allow her to return to a suitable position in the workforce." Pl. SOF ¶ 39. To answer

that question, Dr. Noel compared her score from the SGAB test he administered in 2007 (raw score of 35) with her score from 1991 (raw score of 63). *Id.* Dr. Noel indicated that Holmstrom's 2007 score placed her in the 5th percentile of management candidates. *Id.* He concluded that her marked decline was atypical and that if she returned to the workforce she would likely experience difficulty focusing, retaining information, processing, and making decisions. *Id.*

Met Life consulted Robert Manolakas, M.D., a Diplomate of the American Board of Pain Medicine and the American Board of physical Medicine and Rehabilitation. Def. SOF ¶ 66. Dr. Manolakas reviewed the records in Holmstrom's file and stated his opinions and conclusions in a report dated August 23, 2007. *Id.* In that report Dr. Manolakas noted that he spoke with Dr. Vant on August 23, 2007, and summarized their conversation as follows:

> Dr. Vant was contacted on 8/23/07 at 1:35 hrs pst. The reviewer identified himself and the purpose of the call. The doctor stated that he last treated the claimant about a month ago, who was still complaining of pain in her right arm. He states she may have some decreased strength in her right arm, which could be disuse atrophy. The basis of this was subjective, and circumferential measurements were not done. The weakness is primarily in her biceps muscle. She has no dystrophic changes, but she has a temperature difference in the right arm that was unspecified. She does not move the right arm. He believes she has CRPS in the right arm. This diagnosis was made before he first saw her clinically. Sensation is normal and no dysesthesia or allodynia was mentioned. The doctor mentioned that latest EMG/NCS and bone scan were negative. He does not know what her physical functional capacity is for sure, currently, but she probably cannot do full time desk work. She is only getting medication at this time for treatment: clonodine .1 bid; methadone 250 bid; hydomorphone 32 qhs; and she has side effects, such as poor memory that has not been quantified by him.

*Id.* ¶ 67. Dr. Manolakas' report also opined that the result of the March 2007 FCE did not include the raw data or validity observations or criteria and that it was not clear whether the results of that FCE were the result of poor effort or physical incapacity. *Id.* ¶ 68. He also stated that "summaries of the reports indicate that the claimant has pain issues with regard to functional

capacity and also cognition. She is on very significant analgesia for pain, and the methadone dosage is particularly significant." Pl. Resp. ¶ 69. He continued, "[t]he physical exam findings to support significant "RSD" of the [right upper extremity] are currently few and there is little physical exam and clinical basis for current PHYSICAL impairment of the [right upper extremity]." Def. SOF ¶ 69.

Dr. Manolakas then proceeded to answer questions posed to him:

1.    Yes, physical functional limitations are supported past 8/5/05, but not severe limitations. The available medical in file does support some limitation of physical capacity, but not all. In the peer call of 8/23/07, Dr. Vant described medication dosage and those levels of analgesia support some severity of symptoms. The claimant has also had three surgeries to her right UE with residual scar tissue from the operations. In the 12/15/99 note the claimant reports pain in right hand for years in digits four and five; Cornelison, D.O. noted mild ulnar nerve block of the right elbow with some denervation; PE was positive for Tinel's at the right elbow. Therefore, we know she early on had some ulnar nerve problems. In the 6/7/05 exam noted above, dysesthesia around the right elbow was noted. Balanced against this are the negative findings on EMG/NCS studies most recently; the negative bone scan, no neurological findings, the lack of positive findings on PE such as dystrophic changes and measured atrophy or temperature changes in the RUE currently; specific deficit of range of motion of the RUE joints is not currently documented; mention of contracture or deformity which is often seen in significantly longstanding CRPS is not currently on file. Biceps atrophy on a nerve injury basis cannot be explained by an ulnar lesion.

2.    Based upon the above, the available medical data in file does NOT support PRECLUSION of the following activities: standing and walking up to 33% of a normal eight hour work day with a few minutes rest or change of position every hour; sitting up to 66% of a normal eight hour work day with change of position every hour for a few minutes rest and change of position; lifting and carrying and pushing and pulling up to ten pounds 33% of a work day and up to five pounds 66% of a work day; reaching and handling and grasping and fingering and repetitive movements of the hands and arms are limited to frequent; crawling and balancing at heights and climbing scaffolds and ladders and operation of heavy dangerous machinery including heavy trucks is precluded due to safety concerns.

Def. SOF ¶¶ 70-71.

Met Life consulted Carol P. Walker, Ph.D., a neuropsychologist, who reviewed the documents contained in the administrative record and stated her opinions and conclusions in a report to Met Life dated August 17, 2007. Def. SOF ¶ 72. In responding to questions posed by Met Life, Dr. Walker stated:

> 1. The only objective testing that was reported is the Schubert General Ability Battery. This is a test that allows the estimation of intellectual capacity. As such, it does not measure an individual's overall cognitive abilities. * * * Dr. Noel has apparently based his opinions on a test that is developed to be used for an estimate of intellectual capacity and one that does not have appropriate measures of symptom validity. Such a measure will not allow an individual to make inferences regarding the person's overall cognitive ability. Although a test may have appropriate reliability and validity for its intended purpose, it cannot be used to infer beyond the purpose for which it is developed. Moreover, changes in individual performances cannot be determined to be reliable or valid without specific measures of symptom validity.

Def. SOF ¶ 74; Pl. Resp. ¶ 74.

The reports of Drs. Manolakas and Walker were then submitted to Holmstrom's physicians (Drs. Lomax, Hale, Noel and Vant) to which only Drs. Vant and Noel responded. Pl. SOF ¶ 15; Def. Resp. ¶ 15.

On October 8, 2007, Dr. Manolakas prepared an Addendum to his report in which he stated that he treats patients, as well as evaluates medical files, and that he also reviews medical files for law firms representing disability claimants. Def. SOF ¶ 75. Dr. Manolakas stated that his review was confined to physical impairment and noted that the medication that Plaintiff was taking was substantial, so significant side effects could be expected. Pl. Resp. ¶ 75. He also indicated that "more likely than not, the right upper extremity would be limited currently to occasional handling and grasping and fingering, in an eight hour workday." *Id.*

On October 15, 2007, Dr. Walker prepared an Addendum to her August 17, 2007, which stated:

> Neuropsychologists are the specialists trained to examine the relationship between the functioning of the brain and behavior. This often includes assessment utilizing testing of cognitive functioning by tests that have been developed specifically for this purpose. While intellectual functioning assessment is often part of the battery of the neuropsychologist, it is not used alone to make a determination of an individual's abilities.

Def. SOF ¶ 76.

In a letter dated October 29, 2007, Met Life issued a decision upholding the termination of Holmstrom's long term disability benefits. Pl. SOF ¶ 16.

During its handling of her claim, Met Life referred Holmstrom to an attorney for assistance in applying for Social Security disability benefits. Pl. SOF ¶ 17; Def. Resp. ¶ 17. Holmstrom received retroactive primary Social Security disability benefits in the monthly amount of $763.00 (rounded down to the nearest dollar) for the period of July 2000 to December 2000. Def. SOF ¶ 77. Effective January 2001, Holmstrom received a $13.00 per month increase in her primary social security benefits as a credit for additional earnings. *Id*. ¶ 78. Not accounting for cost of living adjustments, Holmstrom received monthly benefits of $776.00 from January 2001 to August 2005. *Id*. During the period from July 3, 2000 to August 5, 2005, Met Life paid long term disability benefits to Holmstrom under the Plan in the monthly amount of $2,591.78. *Id*. ¶ 79.

## III.    Standard of Review

### A.    Summary Judgment Standard

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of*

*Lafayette,* 359 F.3d 925, 928 (7th Cir. 2004). "When, as here, cross-motions for summary judgment are filed, we look to the burden of proof that each party would bear on an issue at trial; we then require that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact." *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997). For claims seeking benefits under an ERISA plan "at trial the plaintiffs would bear the burden of proving [the beneficiary's] entitlement to the benefits of the insurance coverage, and the defendant [insurer] would bear the burden of establishing [the beneficiary's] lack of entitlement * * *." *Id.*

A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 252.

### B.    ERISA Standard of Review

Holmstrom seeks review of the Plan's termination of her long-term disability benefits. The Court will review that decision *de novo* unless the plan gives the administrator clear discretion to construe policy terms and the eligibility for benefits. See *Firestone Tire and*

*Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). A court may, however, apply the more deferential arbitrary and capricious standard if the plan documents give "the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone*, 489 U.S. at 115. Holmstrom concedes that the Plan documents contain sufficient language to confer discretionary authority. Plaintiff nevertheless contends that the Court should review Met Life's determination *de novo* because Illinois maintains a ban on enforcement of discretionary clauses.[6] The regulation on which Plaintiff relies states:

> No policy, contract, certificate, endorsement, rider application or agreement offered or issued in this State, by a health carrier, to provide, deliver, arrange for pay for or reimburse any of these costs of health care services or for a disability may contain a provision purporting to reserve discretion to the health carrier to interpret the terms of the contract, or to provide standards of interpretation or review that are inconsistent with the laws of this State.

50 Ill. Admin. Code § 2001.3. Defendants argue that the regulation is temporally inapplicable to this case and, in the alternative, preempted by ERISA. Because the Court agrees with Defendants on the first point, discussion of the second is unnecessary.

The Plan became effective September 1, 1999; the regulation had an effective date of July 1, 2005; and Holmstrom's benefits were terminated effective August 2005. The regulation affects policies "offered or issued" after the effective date. The Plan, issued nearly six years prior to that date, would appear to fall outside the scope of this prohibition. Holmstrom attempts to avoid this hurdle by arguing that she had to re-enroll each year to qualify for benefits and that each year's policy constituted a distinct contract. Therefore, according to Holmstrom, when she

---

[6] Plaintiff argued in her opening brief that an opinion letter issued by the General Counsel for the California Department of Insurance stating that discretionary clauses are "fraudulent or unsound" in violation of the California Insurance Code also necessitates *de novo* review. Assuming that California law even applies, the advisory opinion is no way legally binding, a fact which Plaintiff apparently concedes by abandoning the argument in her subsequent brief.

re-enrolled after the effective date of the regulation, Section 2001.3 was incorporated into the Plan and must now be followed by this Court.

Even if the Court were to agree with Holmstrom's re-enrollment argument, her position still could not prevail. Holmstrom cites *Hackett v. Xerox*, 315, F.3d 771 (7th Cir. 2003), for the proposition that the Court must look at the plan as of the date of termination. At the date of termination, August 2005, Plaintiff had not yet re-enrolled subsequent to the effective date of Section 2001.3. The first "re-enrollment" after Section 2001.3 was enacted would not take place until September 2005, one month after the termination. Therefore, even under Plaintiff's theory, the regulation was not included in the Plan at the time of termination. The only case that Plaintiff has found to support her argument, *Bake v. Life Ins. Co. of North America*, No. 07 C 6600, Slip. Op. (N.D. Ill. Apr. 4, 2008), is distinguishable on several levels. Initially, the court applied a *de novo* standard because the plan at issue lacked the necessary language to permit discretionary review. Although there was also a discussion of Section 2001.3, it was purely dicta and the court noted the plan *required* re-enrollment each year, a provision that does not appear to be contained in Holmstrom's Plan. *Bake* involved termination of benefits after both the effective date of the regulation and "re-enrollment." Finally, no court in this district has applied the regulation when the claimant's benefits were initially denied or terminated before the regulation could be said to apply under the "re-enrollment" theory. See *Dreyer v. Metro. Life Ins. Co.*, 459 F. Supp. 2d 675 (N.D. Ill. 2006); *Williams v. Group Long Term Disability Ins.*, 2006 WL 2252550 (N.D. Ill. Aug. 2, 2006); *Guerrero v. Hartford Fin. Servs. Group*, 2006 WL 1120526 (N.D. Ill. Apr. 26, 2006); *Marszalek v. Marszalek & Marszalek Plan*, 485 F. Supp. 2d 935 (N.D. Ill. Apr. 30, 2007).

Because the Court concludes that Section 2001.3 cannot be applied to the facts of this case and it is unnecessary to proceed to the preemption issue, the Court will review Defendants' termination decision under the arbitrary and capricious standard, pursuant to which that decision is entitled to "great deference." See *Ruiz v. Cont'l Cas. Co.*, 400 F.3d 986, 991 (7th Cir. 2005) (citation omitted). Disagreement with the insurer's decision is insufficient. A court cannot overturn a decision to deny benefits unless the decision was "downright unreasonable." See *id.* However, a potential conflict of interest, existing when an insurer both pays and administers claims (which Met Life did in this case), is "one factor among many" that a court may consider in determining whether there is an abuse of discretion, although it does not change the standard of review. See *Metro. Life Ins .Co. v. Glenn*, 128 S.Ct. 2343, 2350-2351 (2008).

## IV. Analysis

### A. Met Life's Termination of Long-Term Disability Benefits

An administrator's decision will not be deemed arbitrary and capricious "as long as (1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem." *Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 321-322 (7th Cir. 2007) (citations omitted). A termination decision must "comply with the requirements of ERISA 'that specific reasons for denial be communicated to the claimant and that the claimant be afforded an opportunity for full and fair review by the administrator.'" *Leger v. Tribune Co. Long Term Disability Benefit Plan*, --- F.3d ---, 2009 WL 579246, at *6 (7th Cir. Mar. 9, 2009) (quoting *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 688-689 (7th Cir. 1992)). To satisfy full and fair review under ERISA, "the administrator must weigh the evidence for and against [the

denial or termination of benefits], and within reasonable limits, the reasons for rejecting evidence must be articulated if there is be meaningful appellate review." *Hackett*, 315 F.3d at 775 (quoting *Halpin*, 962 F.2d at 695). Plaintiff broadly argues that Defendants acted arbitrarily and capriciously by engaging in selective review of the evidence supporting Holmstrom's claim. The specific points that underlie Plaintiff's argument will be dealt with in turn.

### 1. Evidence of Improvement

As an initial matter, the Court rejects Plaintiff's argument that Met Life's decision was arbitrary and capricious because it failed to observe an improvement in Holmstrom's condition before it terminated her LTD benefits. The Seventh Circuit recently addressed – and rejected – that argument as impermissibly broad. *See Leger*, 2009 WL 579246 at *7. "The fact that a plan administrator has made an initial benefits determination in favor of the claimant is evidence that, at least initially, the administrator believed that the claimant was disabled as defined by the plan." *Id*. But such "evidence" is but one factor in the court's overall review process, and not a factor that "create[s] a presumptive burden for the plan to overcome." *Id*.

In this case, Met Life made determinations in 2000 - 2002, while Holmstrom was undergoing multiple surgeries, that she was disabled from working in her "regular occupation" and then in "any occupation." When Met Life conducted its review of Holmstrom's file in 2002, she recently had undergone a third surgery on her right arm. Nearly three years then passed before Met Life began its next review of Holmstrom's claim – a review that ended in the termination of her benefits. Compared to the extensive medical reports and recent surgery that existed when Met Life made its disability determination in 2002, there were large gaps in the record between July 2002 and May 2005. In addition, although Holmstrom continued to receive pain medication, she no longer was undergoing surgeries on her right arm. When Met Life asked

for an update in her condition that would support continued disability, it found such evidence to be lacking.

*Leger* favorably cited a decision in which the court commented that "in determining whether an insurer has properly terminated benefits that it initially undertook to pay out, it is important to focus on the events that occurred between the conclusion that benefits were owing and the decision to terminate them." *Leger*, 2009 WL 579246, at *8 (quoting *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002)). And in *Leger* itself, the court held that the plan acted in an arbitrary and capricious manner after commenting on the plan's failure to mention the "voluminous medical record that spanned the time between the award of benefits and its subsequent review of those benefits." *Id.* at *8. Here, by contrast, at least in the period between Met Life's initial decision to pay benefits and its subsequent termination of those benefits, the record is scant, and thus little or no weight can be given to the presence or absence of improvement in Holmstrom's condition over that time frame in regard to whether Met Life engaged in arbitrary and capricious behavior.

### 2. Improperly Dismissed Her Pain Symptoms

Holmstrom next contends that there is overwhelming evidence in the record demonstrating severe and intractable pain in her right arm and hand from CRPS and that Met Life acted in an arbitrary and capricious manner in not considering and giving due weight to that evidence. The record clearly shows that Holmstrom received substantial doses of medication following her surgeries and through Met Life's termination of benefits decision and the appeals process. Met Life contends that Plaintiff's pain symptoms were wholly subjective and that she failed to provide reliable evidence of how that subjective pain affected her functional abilities. The challenges of evaluating subjective evidence frequently have arisen in the ERISA context –

in fact, so much so that the Seventh Circuit has "expressed concern over the distinction between subjective and objective evidence of symptoms such as pain and fatigue." *Williams*, 509 F.3d 317, 322 (7th Cir. 2007) (citing *Hawkins v. First Union Corp. Long Term Disability Plan*, 326 F.3d 914, 919 (7th Cir. 2003)); see also *Leger*, 2009 WL 579246, at *9. Resolution of this issue depends largely on where on the spectrum of these cases Plaintiff's claim and Met Life's denial of benefits lie.

In *Hawkins*, the claimant's alleged disability predicated on subjective complaints of pain related to fibromyalgia.[7] *Hawkins*, 326 F.3d at 916. The plan denied benefits because an activities questionnaire filled out by the claimant indicated a greater ability to work than his treating rheumatologist reported he was capable of doing. After reviewing the medical files and talking to the rheumatologist, the plan's consultant determined that the claimant was not disabled. *Id*. The consultant reported that "the majority of individuals with fibromyalgia are able to work"; "there are no objective findings to support restrictions"; and "an inability to work within the guidelines * * * is not objectively supported in the medical records." *Id*. at 918-919.

Although the Seventh Circuit found it to be a "close case" in light of the deferential standard of review, it held that the plan acted arbitrarily and capriciously in denying benefits. *Id*. The court noted numerous problems with the consultant's report, and stated that the "gravest problem" was "the weight he place[d] on the difference between subjective and objective evidence of pain. Pain often and in the case of fibromyalgia cannot be detected by laboratory tests." *Id*. After noting the numerous deficiencies in the report, the court noted that the record

---

[7] Fibromyalgia, "also known as fibrositis [is] a common, but elusive and mysterious, disease, much like chronic fatigue syndrome, with which it shares a number of features. Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia." *Sarchet v. Chater*, 78 F.3d 305, 306-307 (7th Cir. 1996) (citations omitted).

contained nothing "more than scraps" to offset the evidence presented by the claimant. In those circumstances, the court found the denial to be unreasonable. *Id.*

After *Hawkins*, the Seventh Circuit again considered the challenges of dealing with subjective evidence in *Williams*. That case involved an appeal of the denial of benefits to a claimant with CFS on the ground that he had not presented sufficient evidence that he could not perform his job functions. *Williams*, 509 F.3d at 318-22. In affirming that ruling, the Seventh Circuit specifically stated that a "distinction exists [] between the amount of fatigue or pain an individual experiences, which as *Hawkins* notes is entirely subjective, and how much an individual's degree of pain or fatigue limits his functional capabilities, which can be objectively measured." *Id.* The court then held that the plan had not acted arbitrarily and capriciously because the limitations on the claimant as a result of fatigue could have been objectively measured and the "record lacked accurate documentation in this regard." *Id.* at 323. The functional capacity questionnaire was "not accurately completed" by the physician because he noted that certain capabilities were "untested" and yet made conclusions about the claimant's ability to perform the same task in an eight hour day. *Id.*

Earlier this month the Seventh Circuit again revisited these issues in connection with an appeal by a claimant with osteoarthritis. See *Leger*, 2009 WL 579246, at *1. In *Leger*, the claimant submitted results from an FCE indicating that she was disabled. *Id.* at *8-9. The consultant hired by the plan gave little weight to the results because the limitations noted in the FCE were based on subjective complaints of pain and not supported by an objectively documented deficit. *Id.* at *9. The court agreed with the claimant that the plan's determination suffered from the same type of shortcomings that were present in *Hawkins*. *Id.* The court also

noted that the plan ignored evidence in the FCE that the claimant's complaints of pain were reliable. *Id.* As the court explained,

> Under these circumstances, we believe it was incumbent on the Plan (or the Plan's consultant) to do more than just dismiss the complaints out of hand. Instead, the Plan must explain why, despite evidence to the contrary in the FCE, it nevertheless finds [claimant's] complaints of pain unreliable and why, if the complaints in fact are reliable, the pain [claimant] is experiencing is not completely debilitating. Without further explanation, there is an 'absence of reasoning in the record' to support the Plan's conclusion * * *.

*Id.* In addition to the consultant's faulty FCE analysis, the plan also failed to consider the claimant's complete medical history (which was extensive and included objective evidence of the underlying condition). See *id.* at *10.

Taking into account all of the Seventh Circuit decisions discussed above, the Court concludes that although a plan may not dismiss functional limitations based solely on subjective complaints of pain (see *Hawkins* and *Leger*), there is nothing improper about requiring reliable testing of limitations imposed by a claimant's subjective complaints of pain (see *Williams*). In fact, *Williams* indicates that a plan administrator is not required to accept mere conclusions that a claimant lacks functionality without evidence that the claimant's limitations and capabilities were properly tested. In addition, *Leger* suggests that when a claimant's disability is diagnosed or confirmed by objective testing, greater weight should be given to subjective complaints of pain. Conversely, it seems fair to infer that if a claimant's basis for disability can be diagnosed through evidence derived from objective testing, but such evidence is lacking, less weight should be given to subjective complaints of pain.[8]

---

[8] Both parties have cited to guidelines outside of the administrative record that list the symptoms of CRPS. Although Met Life concedes the diagnosis for purposes of this motion, it maintains that objective evidence to support *advanced stage* CRPS is lacking and specifically notes the negative bone scan and EMG. Plaintiff points out that her medical chart indicates "hyperhydrosis," "sweating," and "spasm," but Dr. Vant essentially conceded the absence of objective evidence to support *advanced stage* CRPS when he stated the "predominant symptom of her disability is intractable pain * * *." Accordingly, while

Using this structure, it seems appropriate to break down Met Life's consideration of Holmstrom's subjective complaints of pain at three intervals: prior to its initial termination of benefits; before rejection of the first appeal; and leading up the final appeal. Met Life's initial termination did not improperly reject Holmstrom's complaints of pain. At that point, it only had Dr. Vant's APS and PCE. Plaintiff's subjective complaints may have been the underlying cause of Dr. Vant's restrictions and limitations. Although Dr. Vant listed conclusions about what Holmstrom was able to do, there was no evidence of testing in the record that would indicate those restrictions were reliable. As *Williams* teaches, in view of the absence of objective testing of the limits caused by Holmstrom's pain, Met Life acted reasonably in its initial termination of Holmstrom's benefits.

Unlike the initial termination, there at least was some evidence in the record of restrictions caused by pain when Met Life denied the first appeal. Plaintiff submitted an FCE in August 2005 that documented restrictions that, if accepted, may have supported a finding of disability. Unlike Dr. Vant's initial APS and PCE, the August 2005 submission was supported by functional testing. However, Met Life relied on its consultant, who analyzed the results and, after speaking with Dr. Vant, found them unreliable "based on the emotional component displayed by Ms. Holmstrom during the exam, her inability or unwillingness to flex or extend at the lumbar spine and limitations in those joints which are known not to be affected by her pain complaints." The latter ground was supported by Dr. Vant's statement that Holmstrom had range of motion superior to that listed in the FCE. In June 2005, Dr. Klein also noted that Holmstrom had good range of neck motion. In short, Met Life did not reject the FCE results out of hand based on subjective complaints of pain; rather, it listed fundamental flaws in some of the

Holmstrom's complaints of pain cannot be disregarded, Met Life was within its rights to subject those complaints to scrutiny and testing.

results which it felt cast doubt on the entire testing process. While probably not as clear a case as *Williams* – in which the court noted numerous shortcomings in the report substantiating incapacity – the basis for Met Life's denial was reasonable and clearly was stated in the denial letter. That is all that is required under Seventh Circuit precedent.

Met Life's reasons for denying the second appeal and rejecting the FCE included in support of that appeal present a closer question. Initially, the Court rejects Met Life's argument that an FCE completed and submitted 1½ years after termination of benefits cannot provide relevant data. Accepting that position would mean that an initial termination of benefits based on lack of supporting functional evidence could not be successfully appealed if the claimant had not undergone functional testing prior to termination. When Holmstrom initially filed suit in this district, the parties agreed to a remand so that she could address issues raised by Dr. Collins. Those issues included a lack of objective evidence in regard to both physical limitations and the neurocognitive impact of her pain medication. If Met Life did not intend to consider that information, it should not have agreed to a remand. And if it did not consider the provided evidence on that basis, it would not have given Holmstrom the full and fair review to which she was entitled.

Met Life also argues that it rejected the 2007 FCE for the same reasons it rejected the 2005 FCE – lack of reliability. It contends that that the FCE "failed to contain any validity tests or measures of reliability" and "merely documented the amount of time Holmstrom indicated that she could no longer stand, walk, lift or carry." For instance, the FCE based its assessment of Holmstrom's standing tolerance on the statement that "Mrs. Holmstrom stood for 6 minutes on both legs before asking for a seat, one leg stance test recorded 15 secs on right leg and 10 secs on left leg." Her sitting tolerance was based on the statement that "Mrs. Holmstrom sat for 20

minutes. Her sitting tolerance did not meet the Demand Minimum Functional Capacity requirement for sitting for 30 minutes continuously." In its denial of final appeal, Met Life noted that "the consultant added that the current clinical notes are few and even the FCE and neuropsychological reports are incomplete, in that the raw data and validity reports are missing from the file." Plaintiff argues that Met Life's consultant, Dr. Manolakas, "bewilderingly went on to reject the 2007 FCE based on lack of 'raw data' even though that report included the results of Holmstrom's measured capacity in multiple areas." Although the FCE does not appear to be as inadequate as the one in *Williams*, Dr. Manolakas found it lacking in the raw data support required to imbue it with reliability.[9]

Plaintiff points to other evidence in the record substantiating her pain symptoms, including a history of pain medication and nerve blocks. In support, she cites a Seventh Circuit decision in which the court noted the "improbability that [the claimant] would have undergone the pain-treatment procedures that she did, which included not only heavy doses of strong drugs such as Vicodin, Toradol, Demerol, and even morphine, but also the surgical implantation in her spine of a catheter and a spinal-cord stimulator, merely in order to strengthen the credibility of her complaints of pain and so increase her chances of obtaining disability benefits * * *." *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004). As an initial matter, it is difficult to compare Holmstrom's medical history with that of the plaintiff in *Carradine*. When Met Life

---

[9] After listing the medical documentation that he reviewed, Dr. Manolakas specifically stated, "FCE; March 7 and 8; claimant was able to crawl on her hands and knees; conclusions given; data not in file." In his discussion of the available medical documentation on file, he noted that "the current clinical notes are few and even the FCE and neuropsychological reports are incomplete, in that the raw data and validity reports are not found in file." Finally, in his conclusion, Dr. Manolakas stated that the FCE "did not include the raw data or validity observations or criteria (at least not found in file), so it is unclear on what basis precisely the lack of performance is due to: i.e. physical incapacity or poor effort for whatever reason. The language suggests poor effort and endurance, but without the entire report or a repeat study this is not able to be determined for sure." Dr. Manolakas thus laid out his reasons for rejecting the conclusions of the FCE – reasons that cannot be deemed arbitrary.

terminated Holmstrom's benefits, her "pain treatment procedures" were limited to medication. In *Carradine*, by contrast, the claimant continued to require procedures using spinal catheters and spinal stimulators. In fact, when Plaintiff was undergoing arguably similar procedures to relieve her pain, she did receive benefits. But that period was well in the past at the point of termination. Finally, even if the Court were to view *Carradine* as roughly analogous, *Williams* still permits a plan to consider evidence (or the lack thereof) of how a claimant's pain affects her functional capacity. See *Williams*, 509 F.3d at 323.[10]

Plaintiff's complaints of pain naturally were subjective. A plan administrator may not deny or terminate benefits on that basis alone. The administrator may, however, request reliable, objective evidence of how that subjective pain impacts functional capacity – and may factor the quality and quantity of such evidence in its benefits determination. *Williams*, 509 F.3d at 318-23. In deciding to terminate Holmstrom's benefits, Met Life found such evidence wanting, as it explained in its denial letters. On the record of this case, Met Life's decision does not constitute an abuse of discretion.

### 3. Disregard of treating physicians and reliance on hired doctors

Holmstrom next argues that Met Life's decision was arbitrary and capricious because it relied exclusively on opinions based on file review as opposed to physical examination. However, the Seventh Circuit has found such a procedure to be acceptable. See *Leger*, 2009 WL 579246, at *7; *Davis v. Unum Life Ins. Co. of America*, 444 F.3d 569, 577 (7th Cir. 2006). Plaintiff also contends that Met Life could not disregard, without cause, the contrary opinions of

---

[10] Holmstrom also claims that her pain symptoms were evidenced through letters provided by her family members – evidence that she contends Met Life "entirely ignored." Although it appears that Met Life did not give any weight to the letters, one of the consultants did note the existence of the letters, but chose not to credit them because the limitations discussed were not "quantified in any objective manner via testing."

her treating physician. Met Life maintains that it relied on the reasoned medical opinions of its consultants and that their disagreement with Dr. Vant was not arbitrary.

Met Life initially terminated Plaintiff's benefits in August 2005 on the ground that Plaintiff lacked support for her claims of disability. Dr. Thomas, the consultant who reviewed the file for Met Life, analyzed Plaintiff's medical records from the initial surgery in 1999 to 2002 (at which point the records stopped following the determination of disability under any occupation) and an APS and PCE, both completed by Dr. Vant. The APS and PCE concluded that Holmstrom was "permanently disabled." After failing to receive supporting information from Dr. Vant, Dr. Thomas stated that "there is no medical information to support the restrictions provided by Dr. Vant indicating that you can sit 1 hour, and you can not stand, walk, or sit. In addition, your primary diagnosis is reflex Symptomatic Distrophy which would not account for a restriction in your inability to stand and walk." The letter suggests that medical information that might support her disability included "office notes, physical exam findings, emg results, mri results, pain management notes, neurology notes, and/or physical therapy notes." The termination letter also noted that there was no objective evidence supporting disability based on a psychiatric condition.

Dr. Thomas' request for supporting evidence in light of his assessment that Holmstrom's treating physician had submitted "the most restrictive APS in the file" and his observation that there was a gap of nearly three years in Holmstrom's records was eminently reasonable. When that evidence was not produced, Dr. Thomas deemed the APS and PCE unreliable because they lacked substantiation. As noted above, when a claimant's limitations are based on subjective complaints of pain, it is permissible to request objective testing. No such testing was evident, either from Dr. Vant's opinion or Holmstrom's records generally. Dr. Thomas and Met Life

pointed out that shortcoming and suggested ways in which Holmstrom could remedy it. Those actions did not arbitrarily disregard Dr. Vant's opinions.

After the initial termination of benefits, Plaintiff provided further evidence, including: (i) two letters by Dr. Vant; (ii) Dr. Vant's examination notes from July 2004 to July 2005; (iii) Plaintiff's own statement of medial history; (iv) a nuclear bone scan from August 2004; (v) and EMG from June 2005; (vi) an FCE from August 31, 2005; (vii) Social Security Administration award letter from January 2005; (viii) letters from her family members. When Holmstrom appealed, Met Life used a different consultant, Dr. Collins. Her report indicates that she reviewed Dr. Thomas' report from July 2005, the FCE from August 2005, Dr. Vant's letters, and a letter from Holmstrom's attorney. Dr. Collins based her opinion solely on a review of Holmstrom's file and although her opinion differed from Dr. Vant's, it was not arbitrary. To the extent that CRPS can be diagnosed with objective evidence, the bone scan and the EMG, supported her determination.[11] More importantly, as discussed above, there was no reliable, objective evidence of how Plaintiff's subjective complaints of pain would affect her ability to perform any occupation. Dr. Collins insisted on objectively testing her pain induced limitations (which as noted above were lacking), whereas Dr. Vant did not. That alone is a reasoned basis for coming to a different conclusion. Plaintiff argues that Dr. Collins should have relied on Dr. Vant's opinion as to her subjective pain, because pain is "all but impossible for a physician who merely performs a file review to accurately assess." That may be true, but as the Seventh Circuit stated in *Williams*, "how much an individual's degree of pain or fatigue limits his functional capabilities [] can be objectively measured." *Williams*, 509 F.3d at 322. There was no evidence

---

[11] They were referenced in Dr. Vant's letter from December 19, 2005, and in that context noted by Dr. Collins

that Dr. Vant objectively measured how Holmstrom's pain limited her functional capabilities and therefore it was not arbitrary for Met Life's consulting doctors to come to a different conclusion.

Dr. Manolakas' disagreement with Dr. Vant is not arbitrary primarily for the same reason as Dr. Collins': the absence of objective evidence of how Holmstrom's pain limited her capabilities. The gist of the Dr. Vant's disagreement with Dr. Manolakas is that there are "simply no objective tests" for RSDS and that physical examination revealed deficits in her right arm which also were reflected in the FCE. Met Life found the FCE unreliable and Dr. Vant relied on Holmstrom's subjective complaints of pain. In the absence of objective testing, Dr. Manolakas cannot be said to have *arbitrarily* reached a different conclusion.

When a claimant's disability is based on subjective pain, as it was here, it is not improper to request reliable testing to measure physical limitations caused by pain and to consider the presence or absence of such test results in rendering a determination. All three consultants disagreed with Dr. Vant primarily on the basis that there was no objective evidence supporting Plaintiff's claim that she was unable to work. Dr. Vant took Plaintiff at her word, while Met Life sought objective evidence. Disregarding Dr. Vant's opinions on that basis was not arbitrary.

### 4. Ignored Cognitive Impairments

Plaintiff maintains that Met Life did not properly consider how the side effects from Holmstrom's pain medication affected her ability to work. Met Life commented in its denial of Holmstrom's first appeal that the record lacked evidence of this issue. Met Life points out that there is a "reasonable disagreement in the medical literature as to whether methadone even has sedating side-effects." Such a disagreement made testing all the more imperative. Dr. Kent Noel

administered the Schubert General Ability Battery ("SGAB") test in March of 2007.[12]  Based on the results and a noted decrease in Holmstrom's ability in comparison to the results of the same test purportedly taken in 1991, Dr. Noel concluded that Holmstrom "would experience difficulty focusing, retaining, processing, and making decisions" and that if she returned to the workforce "it would be at the most menial level using her physical skills, if these were suitable."  Met Life found that evidence unsatisfactory for two reasons: (i) the SGAB was an improper test to gauge her ability to work in any occupation and (ii) there is no evidence of her alleged baseline 1991 score.

The first issue was raised by a consultant retained by Met Life, Dr. Carol Walker, Ph.D. Dr. Walker opined that the SGAB permits estimation of intellectual capacity and does not measure an individual's overall cognitive ability.  When Dr. Noel responded to Dr. Walker's report, he confronted several other issues and had performed "well over a thousand employment selection assessments."  He also indicated that he did not perform neuropsychological evaluations.  Met Life's final termination letter stated that "while intellectual assessment is often part of the neuropsychologist's battery of tests, it is not used alone to make a determination of an individual's abilities."  Because Met Life requested the information in its denial letter of February 2006, the language of its request is important.  It stated, "[l]acking from the information submitted to determine Ms. Holmstrom's functionality, to assess her neurocognitive status is formalized testing.  This battery of testing, if conducted properly, could assess her ability with regard to processing information, short term memory and general level of function. After such evaluation, a more precise assessment of her work abilities could be made."  Met Life explicitly laid out what additional information it wanted and then provided a reasoned basis,

---

[12] As noted above, the Court rejects Met Life's argument that testing 1½ years after the initial termination should not be considered.  In addition, the record does not reveal that Plaintiff's medication changed in any material way over that period.

consistent with its initial request for neurocognitive testing, for its denial. That determination was not unreasonable.[13]

### 5. Conclusion

This is a close case. As MetLife correctly observes, as in most closely contested cases, the record here contains some evidence both for and against a finding of disability. In such cases, it is the task of the administrator in the first instance – with the assistance of medical professionals and after providing a full and fair opportunity to the claimant to present her case – to weigh that evidence and issue a decision intelligibly explaining its decision. That process frequently requires the administrator and its agents to choose between conflicting medical opinions on what often are debatable questions. The role of the courts then is to filter the work of the administrator through the prism of the applicable standard of review, which may vary depending on the terms of the plan and the role of the administrator.

Here, for the reasons explained above, the arbitrary and capricious standard of review applies. Accordingly, the Court may set aside MetLife's decision only if that decision was "downright unreasonable." *Sisto v. Ameritech Sickness & Accident Disability Benefit Plan*, 429 F.3d 698, 700 (7th Cir. 2005). Holmstrom submits that, notwithstanding a deferential standard of review, the Court should set aside MetLife's denial of benefits because MetLife engaged in selective file review and reached a determination that is against the weight of the evidence in her file. MetLife counters that it paid benefits for several years, consulted with three physicians and a neuropsychologist in its review process, went through two appeals of its initial decision to

---

[13] It is impossible to tell, based on the record before the Court whether Dr. Noel had evidence of the 1991 SGAB when he wrote his letter, and merely failed to attach the results, or if the previous score was self-reported by Plaintiff. Resolution of that issue is not necessary at this time, because the Court finds the first basis offered for Met Life's rejection to be reasonable.

terminate benefits, and made and explained all of its decisions based on a fair evaluation of the record as a whole.

Compounding the difficulty of the decision-making process is both parties' acknowledgment that this case requires evaluation of a good deal of subjective information, including with respect to diagnosis of Holmstrom's condition and the level of pain that she endures as a result of that condition. As the Seventh Circuit has observed, ERISA fiduciaries like MetLife "must consider the possibility that disability applicants are exaggerating in an effort to win benefits (or are sincere hypochondriacs not at serious medical risk)" (*Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 409 (7th Cir. 2004)) and whether the claimant's treating physician is "acting more as an advocate than a doctor rendering objective opinions" (*Davis*, 444 F.3d at 578). MetLife contends that in considering those possibilities, it accepted both that Holmstrom has CRPS on the basis of largely subjective evidence, including with respect to her pain levels. But MetLife further submits that it need not accept subjective evidence of any alleged functional limitations, and was within its rights to insist on objective verification that Holmstrom was unable to work in any gainful occupation because of her medical condition. For her part, Holmstrom vigorously disputes that she is engaged in exaggeration to "win benefits," and asserts that in fact the "opposite is more likely true here."

Holmstrom's attending physician has stated that RSDS/CRPS is not amenable to objective testing and "confirmed that her intractable pain is the reason which he has declared her disabled." However, precedent teaches that a plan may request objective testing of how subjective complaints of pain affect functionality. See *Williams*, 509 F.3d at 318-23. Met Life explained that its decision to terminate Holmstrom's benefits rested on the absence of reliable, objective evidence on that issue. Met Life provided a reasoned basis for rejecting the FCEs and

SGAB that Holmstrom submitted in support of her claim. In view of the deference that must be accorded to Met Life's decision, the Court cannot conclude that Met Life acted in an arbitrary and capricious manner in concluding that Holmstrom's position that pain prevented her from working was not supported by sufficient objective evidence.

In the end, under the deferential standard of review that applies in this case, the Seventh Circuit repeatedly has stated that it is not the function of the courts "to decide whether we would reach the same conclusion as the administrator." *Davis*, 444 F.3d at 576; *Sisto*, 429 F.3d at 701. Mindful of that admonition, the Court carefully has considered the record in light of the parties' adversary presentations and cannot conclude that the evidence and argument submitted on behalf of Holmstrom is so overwhelmingly in her favor that MetLife's decision can be considered "downright unreasonable" (*Sisto*, 429 F.3d at 700), as it must be to be set aside. Nor can the Court find any other basis for finding that MetLife acted arbitrarily and capriciously in denying Holmstrom's benefits claim, such as failing to (i) adequately consider important aspects of the record, (ii) explain the reasons for its conclusions, or (iii) afford a full and fair opportunity to marshal support for the claim. Finally, in view of the lengthy period of time during which Met Life did pay benefits to Holmstrom and the detailed review of her appeals following Met Life's initial decision to terminate those benefits, the "conflict of interest" factor does not tip the scales in the direction of an abuse of discretion. See *Metro Life*, 128 S. Ct. at 2350-51. On the extensive record in this case, the question of whether to continue Holmstrom's benefits after August 2005 presented a debatable proposition. After thorough investigation, MetLife decided against Holmstrom. Because that decision was not arbitrary and capricious, it cannot be overturned by the Court.

## B. Met Life's Counterclaim for Reimbursement

Met Life provided full benefits to Plaintiff under the Plan from January 12, 2000 to August 5, 2005. Holmstrom retroactively received Social Security Disability ("SSD") benefits covering the same period. Met Life has asserted a counterclaim seeking reimbursement of alleged overpayments of benefits on account of those SSD payments.

One pertinent provision of the Plan states that monthly benefits are reduced by other income benefits which include disability payments under the Federal Social Security Act. The Plan further requires the participant to refund "an amount equal to any Overpayment which resulted from any period in which [Met Life was] entitled to, but did not, reduce your Monthly Benefit." The Plan retains the right to recover any amount that it determines to be an overpayment and also places the obligation to refund to any such amount on the claimant. Here, Met Life is attempting to recover overpayment in the amount of $70,107.76.

ERISA allows a fiduciary "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provision of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3). There is no dispute that Met Life is a fiduciary and that it is attempting to enforce a provision of the Plan requiring Holmstrom to refund an asserted overpayment. The crux of the dispute lies in whether Met Life is seeking "equitable relief" under § 1132(a)(3) and whether any independent bars to recovery exist.

The first question is whether this Court has jurisdiction to decide Met Life's claim. To invoke the Court's jurisdiction under Section 1132(a)(3), Met Life must be seeking relief typically available in equity. See *Sereboff v. Mid Atlantic Med. Servs., Inc.*, 547 U.S. 356 (2006). In *Sereboff*, the Supreme Court recently clarified the scope of the remedial power

conferred on district courts by Section 1132(a)(3). To provide context to this most recent clarification, a brief history is in order.

In *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256 (1993), the Supreme Court established a general framework, pursuant to which only "those categories of relief that were typically available in equity" were permissible. The Court therefore rejected a claim that sought "nothing other than compensatory damages." *Id*. The Court refined that framework in *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002). In that case, the insurer paid medical bills on behalf of an insured claimant and then sought to collect the amounts paid from the proceeds of a subsequent tort recovery. *Id*. at 207-209. The plan conferred on the insurer "the right to recover from the [beneficiary] any payment for benefits" paid by the plan and reserved "a first lien upon any recovery, whether by settlement, judgment or otherwise" that the beneficiary receives from [a] third party. *Id*. at 207. The Court rejected the insurer's argument that its claim was equitable simply because it was seeking "restitution." *Id*. at 214. It noted that not all relief entitled "restitution" is equitable and "whether it is legal or equitable depends on the basis for the plaintiff's claim and the nature of the underlying remedies sought." *Id*. at 213 (quoting *Reich v. Cont'l Cas. Co.*, 33 F.3d 754, 756 (7th Cir. 1994)). The remedy sought must seek to "restore to the plaintiff particular funds or property in the defendant's possession." *Id*. at 214. In *Knudson*, the "funds to which petitioners claim[ed] an entitlement" were not in Knudson's possession, but had instead been placed in a Special Needs Trust' under California law. *Id*. The Court thus concluded that the suit could not proceed under Section 1132(a)(3). *Id*. at 218.

In *Sereboff*, plaintiffs' employer paid plaintiffs' medical expenses pursuant to an ERISA plan and then sought reimbursement after plaintiffs recovered tort damages. *Sereboff*, 547 U.S. at 360. The Court began by noting that the "impediment to characterizing the relief in *Knudson*

as equitable" was not present because the insurer sought "specifically identifiable" funds "within the possession and control" of the beneficiary. *Id*. at 362-363. Having passed the nature of relief prong of the test, the Court proceeded to ensure that the basis of the claim also was equitable. *Id*. at 363. After reviewing the "case law from the days of the divided bench," the Court confirmed that the claim was indeed equitable on the basis of a provision of the plan entitled "Acts of Third Parties." That provision required an insured to reimburse the insurer from "[a]ll recoveries from a third party." *Id*. at 364. The Court held that such a provision specifically identified a particular fund distinct from the beneficiary's general assets from which the insurer could recover. *Id*. The provision also identified a particular share of that fund to which the insurer was entitled – "that portion of the total recovery which is due [the insurer] for benefits paid." *Id*. Finally, the Court held that the "Act of Third Parties" provision created an "equitable lien by agreement" and therefore concluded that strict tracing of funds was not required. *Id*. at 364-365.

The question before the Court is whether Met Life's attempt to recover overpayments caused by SSD payments to Holmstrom is a legal or equitable claim. Both the nature of recovery and basis for the claim must be equitable before the claim may go forward. As to the nature of recovery, Met Life seeks to impose a constructive trust or enforce an equitable lien on the amounts of overpayment. As in *Sereboff*, the impediment found in *Knudson* is not present, and therefore the funds sought are within in Holmstrom's possession. Additionally, Met Life seeks recovery of the overpayments made to Holmstrom – a specifically identified fund – and thus the nature of the recovery is equitable under *Sereboff*.

The basis of the claim also must be equitable. The Plan states that participants must refund "an amount equal to any Overpayment which resulted from any period in which we were entitled to, but did not, reduce your Monthly Benefit." Because that reimbursement provision is

indistinguishable from the "Act of Third Parties" provision in *Sereboff*, Met Life's counterclaim satisfies the requirement that the basis of the claim be equitable. See *Gutta v. Standard Trust Ins. Plans*, 530 F.3d 614, 620-621 (7th Cir. 2008) (holding that nearly identical language to that in the Plan was sufficient to bring a counterclaim under § 1132(a)(3)). The Plan identifies a particular share of a specifically identifiable fund - the difference between what Met Life paid and what it should have paid if Holmstrom had abided by the plan terms. Finally, *Sereboff* instructs that there is no strict tracing requirement in this situation because a lien by agreement exists. For all of these reasons, unless an independent bar to Met Life's claim exists, Met Life may bring its counterclaim under 29 U.S.C. § 1132(a)(3).

Holmstrom briefly argued in her initial motion for summary judgment that the counterclaim was not equitable. However, she abandoned that position in her response/reply brief and conceded that S*ereboff* "altered the landscape with respect to benefit plans' claims for reimbursement." Holmstrom next argues that federal social security law, 42 U.S.C. § 407(a), prevents Met Life from recovering the disability overpayments. That Section states:

> The right of any person to any future payment under this subchapter shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law.

*Id*. Plaintiff contends that Section 407(a) precludes third parties such as Met Life from reaching her Social Security benefits.

But Holmstrom's argument rests on a basic misunderstanding of the counterclaim. Met Life is not attempting to attach the equitable lien to her social security benefits. Rather, as discussed above, the proposed lien would attach to the overpayment of money provided by Met Life. The vast majority of courts, both in this district and beyond, have held that when a plan

contains a "lien by agreement" and the "overpayment" is caused by subsequent social security payments, Section 407 presents no bar to recovery. See, e.g., *Smith v. Accenture United States Group Long-Term Disability Ins. Plan*, 2006 WL 2644957 (N.D. Ill. Sept. 13, 2006); *Fregeau v. Life Ins. Co. of North America*, 490 F. Supp. 2d 928 (N.D. Ill. 2007); *Williams v. Group Long Term Disability Ins.*, 2008 WL 2788615 (N.D. Ill. July 17, 2008); *Bosin v. Liberty Life Ins. Co. of Boston*, 2007 WL 1101187 (W.D. Mich. Apr. 11, 2007); *Unum Life Ins. Co. of America v. Harper*, 2008 WL 1990338 (M.D. Ga. May 2, 2008); *Mattox v. Life Ins. Co. of North America*, 536 F. Supp. 2d 1307 (N.D. Ga. 2008); *Gilcrest v. Unum Life Ins. Co. of America*, 2006 WL 2251820 (S.D. Ohio Aug. 4, 2006).

In support of her position Plaintiff cites two cases, one of which, *Ross v. Pennsylvania Mfrs. Ass'n Ins. Co.*, 2006 WL 1390446, at *7-8 (S.D. W. Va. May 22, 2006), is factually distinguishable, and the other of which, *Mote v. Aetna Life Ins. Co.*, 435 F. Supp. 2d 827, 829-830 (N.D. Ill. 2006), contains reasoning that has been questioned by other courts. In *Ross*, the insurer sought to impose an equitable lien upon a portion of the plaintiff's *future* SSD benefits. *Ross*, 2006 WL 1390446, at *8. Section 407 directly prohibits that type of action, and the court properly dismissed the counterclaim. *Ross* is not instructive in this case, because Met Life does not seek future SSD payments – in fact it does not seek SSD payments at all. *Mote* is the only analogous decision that has been cited or located in the Court's research that supports Holmstrom's position. In *Mote*, the court reasoned that once disability payments are commingled with social security funds, Section 407 prevents attachment of the overpayment. However, in *Smith*, 2006 WL 2644957, at *4-*5, the court set forth the basis for its respectful disagreement with the analysis in *Mote*. This Court agrees with the weight of the case law (cited above) holding that an insurer seeking reimbursement in the circumstances present here is not

seeking to attach social security funds. Met Life's counterclaim therefore is not barred by Section 407.

Holmstrom also argues that Met Life failed to exhaust administrative remedies by waiting until the present litigation to seek recovery of overpayments. The Seventh Circuit has not determined whether "the same exhaustion requirement that applies to beneficiaries also applies to ERISA fiduciaries." *Gutta*, 530 F.3d 614. However, in *Gutta*, the court noted that "enforcement of an exhaustion requirement is left to the discretion of the district court." *Id.* (citation omitted); see also *Reliance Standard Life Ins. Co. v. Smith*, 2006 WL 2993054, at *3 (E.D. Tenn. Oct. 18, 2006). It is unclear what might have been gained through exhaustion or exactly who would have provided an initial review of Met Life's request for recovery of overpayments. While Holmstrom argues that she was not given an opportunity to address the claim or to submit evidence and argument against recovery, she does not indicate what evidence may have been available to defeat recovery. Nor does she dispute any of the facts presented by Met Life in regard to the counterclaim. As it stands, the parties whose interest would be affected are now before the Court and efficiency dictates that the counterclaim should proceed to disposition. Finally, as Met Life points out, it is merely seeking *de novo* review and therefore asks for no deference to a previous decision.

Holmstrom raises several other arguments against summary judgment on Met Life's counterclaim, but none is persuasive. Holmstrom contends that Met Life "equitably forfeited" any right to seek reimbursement because it failed to provide assistance in applying for and prosecuting her claim for social security benefits. Holmstrom's factual predicate may be incorrect, for it appears in the record that Defendants at least attempted to provide some assistance to Holmstrom in this regard. But even if Met Life had not attempted to aid Plaintiff,

there was no clause in the Plan that required such assistance before offsetting recovery of social security benefits. That fact distinguishes the only cases cited by Plaintiff to support her argument. See *McCormick v. Metro. Life Ins. Co.*, 514 F. Supp. 2d 158 (D. Mass. 2007).

Holmstrom's last attempt to defeat Met Life's counterclaim also is unavailing. She argues that it would be "unjust" to permit Met Life to recover her SSD benefits after taking the position that the SSA's determination of "total disability" is not entitled to any weight. The Court rejects this argument because, as discussed above, Met Life's counterclaim is not targeting Holmstrom's SSD benefits – the lien attaches to the money that was overpaid according to the Plan. Moreover, because the SSA has different rules for determining disability (*e.g.* the "treating physician rule"), determinations made by the SSA are only considered evidence for ERISA purposes. See *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). There is nothing improper, *per se*, in reaching a different result on the disability determination and then relying on specific language in the Plan to recover overpayments.[14]

## V. Conclusion

For the reasons stated above, Plaintiff's motion for summary judgment [30] is denied and Defendants' motion for summary judgment [45] is granted.

Dated: March 31, 2009

_____
Robert M. Dow, Jr.
United States District Judge

---

[14] Because the Court grants Met Life's summary judgment on its counterclaim pursuant to 29 U.S.C. § 1132(a)(3), there is no need to proceed to its claim for recovery of the same amount pursuant to federal common law.